IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:25-CV-00036-FL

| | |
|---|---|
| **Michael O'Neal Jackson,**<br><br>Plaintiff,<br><br>v.<br><br>**Commissioner of Social Security**,<br><br>Defendant. | **Memorandum & Recommendation** |

Plaintiff Michael O'Neal Jackson challenges an Administrative Law Judge's decision to deny his application for social security income. Jackson claims that the ALJ erred in reaching that decision by finding that he could perform his past work. Both Jackson and Defendant Frank J. Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 14, 16, 17.

After reviewing the parties' arguments, the undersigned has determined that the ALJ erred in his determination. The job code assigned to Jackson's past work fails to address some of his duties. And it appears that his past work may be a composite job. So the undersigned cannot conclude that substantial evidence supports the step four finding. The undersigned thus recommends that the court grant Jackson relief, deny Bisignano relief, and remand this matter to the Commissioner for further consideration.[1]

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

## I. Background

### A. Factual

Jackson visited the emergency department several times for symptoms related to paroxysmal atrial fibrillation. Tr. at 31. Records disclose he usually had supraventricular tachycardiac rhythm consistent with atrial fibrillation with rapid ventricular response that spontaneously converted to sinus rhythm with a diltiazem drip. *Id.* At times, providers admitted him for additional testing, but findings were generally unremarkable. *Id.* Jackson generally denied associated symptoms like pain, fatigue, palpitations, and lightheadedness. *Id.*

Jackson's cardiac episodes usually followed drug or alcohol use or medication noncompliance. *Id.* Providers counseled him to abstain from the substances. *Id.* He tested positive for substances even when he denied using them. *Id.* And Jackson acknowledged continued use of alcohol and marijuana, although he claimed to have reduced his consumption. *Id.*

Jackson reported no cardiac symptoms when he took his medication as prescribed. *Id.* But he did not use his BiPAP and C-PAP machines as instructed. *Id*.

Jackson has a back condition that predates the alleged onset of his disability. A 2010 MRI showed multilevel degenerative disc disease of the lumbar spine with moderate to severe central canal stenosis. *Id.* He treated it conservatively. *Id.* The next year, a functional capacity evaluation determined that Jackson could perform medium to heavy work. *Id.* And he worked for many years before his alleged onset date. *Id*.

In July 2022, Jackson reported low back pain radiating into his lower extremities. *Id.* Walking exacerbated his symptoms. Tr. at 32. An examination revealed a normal range of motion in his spine but a limping gait and positive straight leg raises. *Id.* Providers administered a steroid injection and prescribed muscle relaxants. *Id.* It appears he sought no further treatment. *Id.*

A June 2022 questionnaire completed by Jackson's treating provider, Lu'Shell Hayes, FNP-C, classified his condition as class I under the NYHA guidelines. Tr. at 32. She opined that he could handle moderate stress, frequently lift or carry 10 pounds and occasionally lift or carry 20 pounds, sit for four hours, and stand or walk for four hours. *Id.* And Jackson would miss about three days of work a month. *Id*.

At an April 2023 consultative psychological evaluation, Jackson reported symptoms consistent with depression and anxiety and admitted experimenting with cocaine. Tr. at 33. The examiners observed that he seemed able to understand and follow directions and that his intellectual functioning appeared to fall in the low average range. *Id.* They opined that Jackson had no trouble interacting with others and could understand, retain, and follow instructions to perform simple, routine, repetitive tasks and maintain attention, concentration, and pace. *Id.*

State agency psychological reviewers determined that Jackson had only mild limitations in the four broad areas of mental functioning and found no severe mental impairment. Tr. at 34. State agency medical consultants concluded that Jackson could perform light work with postural and environmental restrictions. *Id.*

Jackson testified about his cardiac symptoms. Tr. at 30. Becoming excited or upset could trigger an irregular heartbeat. *Id.* But he also experienced such symptoms without warning. *Id.* And Jackson also suffered from chest pain, tingling in his extremities, and migraine headaches. *Id.* At times, he became lightheaded or dizzy, such as when bending down. *Id.* Jackson had no improvement in his symptoms since discontinuing alcohol and cocaine several months earlier. *Id*.

Jackson suffered from low back pain. *Id.* He estimated that he could stand for 15 minutes. *Id.* Jackson could only mow the grass for five minutes and used a motorized cart when shopping. *Id.*

## B. Procedural

In June 2022, Jackson applied for supplemental security income and the next month he applied for disability benefits. In both applications, he alleged a disability that began in February 2022. After the Social Security Administration denied his claim at the initial level and upon reconsideration, Jackson appeared for a telephonic hearing before an ALJ to determine whether he was entitled to benefits. The ALJ determined Jackson had no right to benefits because he was not disabled. Tr. at 24–37.

The ALJ found that Jackson lived with several severe impairments. Among these were morbid obesity, degenerative disc disease of the lumbar spine, and paroxysmal atrial fibrillation with rapid ventricular response and mild ventricular hypertrophy. Tr. at 27. The ALJ also found that Jackson's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 28.

Next, the ALJ determined that Jackson had the residual functional capacity (RFC) to perform light work with other limitations. Tr. at 29. He can occasionally climb, stoop, kneel, crouch, crawl, and balance. *Id.* And Jackson can have occasional exposure to fumes, odors, dust, gases, and poor ventilation and hazards such as unprotected heights and moving, mechanical parts. *Id.*

Then the ALJ concluded that Jackson could perform his past work as a jailer as that work is generally performed. *Id.* at 35–36.[2] So the ALJ concluded that Jackson was not disabled. Tr. at 36.

After the Appeals Council denied review, Jackson commenced this action in July 2025. D.E. 1. Both parties ask the court to issue a decision in their favor. D.E. 14, 16, 17.

---

[2] The ALJ also noted he had past relevant work as a corrections officer, construction worker, and welder-helper. Tr. at 35–36. But Jackson could not perform those jobs. *Id.*

## II. Analysis

Jackson contends that the ALJ erred when he found that he could perform his past work because he incorrectly classified it as a jailer position. He maintains that his most recent work aligns more closely with a correctional officer position than jailer, as the Dictionary of Occupational Titles (DOT) describes those jobs.

Although Jackson testified about some of his duties, the ALJ did not elicit evidence about the physical and mental demands of his work on a typical day. The ALJ thus made no findings on what Jackson's past relevant work required. And to the extent his past work demands fall within two positions in the DOT, the ALJ erred in failing to consider whether Jackson's past work is properly characterized as a composite job.

The step four finding is thus unsound. So the court should remand the matter for further consideration.

### A. Standard for Review of the Commissioner's Final Decision

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## B. Standard for Evaluating Disability

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id*.

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id*.

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is not warranted, the ALJ must then assess the claimant's residual functional capacity (RFC). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the

claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

**C. Past Work**

Jackson challenges the step four finding because the ALJ failed to identify the demands of his past relevant work. He argues that his most recent work is better characterized as a corrections officer than jailer in the Dictionary of Occupational Titles (DOT). If his past work does not fit squarely in either job description, Jackson maintains that his work should be considered a composite job. But the ALJ did not examine the possibility that his work was a composite job. And such a finding would nullify the step four finding that Jackson could perform his past job as it is generally performed.

In general terms with little analysis, the Commissioner contends that the ALJ's step four finding is supported by the evidence. The undersigned disagrees. The ALJ erred by failing to elicit sufficient evidence of Jackson's past work and consider if Jackson's past work is a composite job.

So the step four finding is unsound. This error supports granting Jackson relief and remanding the matter.

A claimant is found disabled only if she cannot perform past relevant work and is further unable to engage in other, substantial gainful employment. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant who can perform past relevant work is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) ("If you can still do your past relevant work, we will find that you are not disabled."); *Heckler* v. *Campbell*, 461 U.S. 458, 460 (1983) ("If a claimant can pursue his former occupation, he is not entitled to disability benefits."). A claimant bears the burden of showing that she cannot return to her former employment because of a medically determinable impairment. *Coffman* v. *Bowen*, 829 F.2d 514, 518 (4th Cir. 1987).

The Regulations provide that in determining whether a claimant can perform past relevant work, the ALJ may consult a VE or other resources such as the Dictionary of Occupational Titles. 20 C.F.R. § 404.1560(b)(2), 416.960(b)(2); *see Banks* v. *Massanari*, 258 F.3d 820, 827 (8th Cir. 2001) (concluding that "vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work" and "is not required until step five when the burden shifts to the Commissioner, and then only when the claimant has nonexertional impairments[.]") (citations omitted); *Aurand* v. *Astrue*, No. 6:07-CV-3968, 2009 WL 364389, at *5 (D.S.C. Feb. 12, 2009) (explaining that at step four if the ALJ determines a claimant suffers from significant non-exertional limitations, the ALJ should consider whether the testimony of a VE would help determine whether the claimant can perform past relevant work, but at step five the ALJ must obtain the testimony of the VE as to the effect of non-exertional limitations).

In determining whether a claimant can perform her past relevant work, the Commissioner "will ask [the claimant] for information about work [she] ha[s] done in the past," "may also ask other people who know about [the claimant's] work," and "may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence [] need[ed] to help [] determine whether [a claimant] can do [her] past relevant work, given [her] residual functional capacity." 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). "The claimant is the primary source for vocational documentation." SSR 82–62, 1982 WL 31386, at *3 (Jan. 1, 1982).

At step four, the ALJ must determine whether a claimant retains the RFC to perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv); *see also Thompson* v. *Astrue*, 442 F. App'x 804, 806 (4th Cir. 2011). "[A] claimant will be found 'not disabled' if he is capable of performing past relevant work either as he performed it in the past or as it is generally required by employers in the national economy." *Pass*, 65 F.3d at 1207 (citing SSR 82–61, 1982 WL 31387). So a claimant must show that he cannot return to his previous occupation, and not simply his specific job. *DeLoatche* v. *Heckler*, 715 F.2d 148, 151 (4th Cir. 1983).

The ALJ found that Jackson could perform his past work as a jailer as that work is generally performed. Tr. at 35–36. But his past work as a corrections officer, a medium exertion job, exceeded his RFC. *Id.*

### 1. Jackson's Positions

#### a. Pasquotank Correctional Institute

Jackson worked for several years at the Pasquotank Correctional Institute. This prison is a "closed" facility in Elizbeth City.[3]

In this work, Jackson noted that there would be over a hundred inmates in the yard. Tr. at 59. Most altercations occurred in the dining hall, where all the inmates were together. *Id.* His duties included escorting and transporting inmates to medical appointments or other facilities. *Id.* And there was a lot of breaking up fights. Tr. at 60.

#### b. Albemarle District Jail

Most recently, Jackson worked as a corrections officer in a local jail for about a year. Tr. at 58–59. He testified that he made rounds every half hour, went up and down stairs, delivered food trays to inmates, escorted them to medical visits, and broke up fights. Tr. at 59.

When he began experiencing arterial fibrillation, the facility adjusted Jackson's primary work. Tr. at 68. He would sit in a booth and open doors for the last two-and-a-half months he worked there. Tr. at 66, 68.

Jackson's Disability Report identifies his job title as corrections officer. Tr. at 403. His Work History Report lists the same job title. Tr. at 415. And it described his duties to include checking on inmates every 30 minutes and climbing stairs. Tr. at 416. He estimated that he may have walked up to seven hours, stood up to four hours, sat around two hours, and climbed about

---

[3] North Carolina's Department of Adult Corrections uses "close custody" for "[i]nmates that need extra security and are typically felon offenders who have known records of, or potentials for, significant institutional or community misbehavior. Close custody facilities provide a high level of supervision and tightly controlled perimeters." NCDAC Administrative Analysis Glossary, https://webapps.doc.state.nc.us/apps/asqExt/ASQ?ACTION=DOC_GLOSSARY (last visited July 8, 2026).

six hours in his 12-hour shift. *Id.* Jackson lifted up to 50 pounds and frequently lifted 25 pounds. *Id.*

### 2. Vocational Expert Testimony

The Vocational Expert (VE) classified Jackson's past work at Pasquotank as a correctional officer (DOT code 372.667–018), a job normally performed at the medium exertional level. Tr. at 71. His job at Albemarle was categorized as a jailer (DOT code 372.367–014), which is normally light work. *Id.*

When presented with hypothetical questions that reflected Jackson's RFC, the VE testified that he could perform his past work as a jailer. Tr. at 74.[4] The VE also testified that in both jobs, Jackson acquired skills primarily involving protecting and guarding individuals. Tr. at 76. This fact distinguished the positions from a gate guard or security guard, which focus on property protection. *Id.*

The ALJ remarked that a corrections officer job is actually more demanding than medium work because breaking up fights and dealing with inmates requires heavy or very heavy exertion. Tr. at 77. Jackson reiterated that his work at the jail also involved breaking up fights. *Id.*

The ALJ noted that as a jailer, Jackson occasionally had to restrain inmates. Tr. at 77–78. So the ALJ asked the VE whether, based on his professional experience and Jackson's testimony, the exertion needed for the jailer position job was greater than light work as the DOT classified it. *Id.* The VE noted that the DOT describes jobs as they are normally performed. Tr. at 78. But the "potential for conflict"—breaking up fights—existed in both positions and was "an outlier" and

[4] The ALJ remarked that the state agency had classified Jackson's past work as correction officer, and his skills would transfer to security and gate guard jobs, both light positions. Tr. at 75. The ALJ noted that jailer was also referenced but he believed that the state agency failed to appreciate that Jackson had past work as a jailer. *Id*.

potential threat "in unusual situations" to individuals in those jobs. *Id.* It thus appears that the VE considered such work outside the normal duties or tasks for either a jailer or corrections officer.

### 3. Dictionary of Occupational Titles Job Descriptions

The VE referenced DOT code 372.667–018 for the corrections officer job Jackson held at Pasquotank. The DOT describes that work to include the following duties: guarding inmates; observing their conduct and behavior to prevent disturbances; searching for contraband; patrolling areas; employing weapons or force to maintain discipline and order among prisoners; escorting prisoners; and transporting them. *See* DOT Code 372.667–018. And the DOT lists the position as one of medium exertion. *Id.*

The VE classified Jackson's position at Albemarle as jailer under DOT code 372.367–014. The duties of that work involve: guarding prisoners; assuming responsibility for their needs; locking them in cells after searching them; serving prisoners meals; and obtaining medical aid for them as needed. *See* DOT Code 372.367–014. It is a light exertion job. *Id.*

### 4. May Jackson's Past Work Be a Composite Job?

Jackson claims that his past work as a jailer describes only part of his job duties. He maintains that his past work is better characterized as a composite position of jailer and corrections officer.

A composite job has "significant elements of two or more occupations and, as such, [has] no counterpart in the DOT." SSR 82–61, 1982 WL 31387, at *2. "Such situations will be evaluated according to the particular facts of each individual case." *Id.* When "available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational specialist or vocational expert." *Id.* Past relevant work "may be a composite job if it takes multiple DOT occupations to

locate the main duties of the PRW as described by the claimant." Program Operations Manual System (POMS) DI 25005.020B.[5]

Jackson described his work at Albemarle as checking on inmates, bringing them food trays, and escorting them to medical visits. These responsibilities align with the DOT job description for a jailer. But Jackson stated that the work at Albemarle also included breaking up fights. That task is not among the duties of a jailer. But it does fall within the duties of a corrections officer as the DOT described that work. And that matches Jackson's job title at Albemarle.

What's more, the exertional demands required of Jackson when he worked at Albemarle exceed light work the DOT classifies the jailer position. Jackson described walking up to seven hours, climbing around six hours, standing about four hours, and sitting for two hours. And he would lift up to 50 pounds, and frequently lift 25 pounds. So the demands of his past work may more closely match medium work. And the tasks associated with the position as he actually performed it exceed the parameters of his RFC.

The Administration noted his job titles at both Pasquotank and Albemarle were corrections officer. Tr. at 93, 106. And it referenced both positions as medium exertion and corresponded to the DOT job for corrections officer under code 372.667–018. *Id.*

The ALJ inquired if the VE needed "additional information" before giving his testimony. Tr. at 71. He did not. *Id.*

The ALJ made no determination about the duties of Jackson's past work that he could, or could not, perform, including breaking up fights. This was error. *See Jacob N.* v. *Berryhill*, No.

[5] While POMS guidelines do not have the force and effect of law, they do have some persuasive value. *See Alyssa W.* v. *O'Malley*, No. 1:22-CV-919, 2024 WL 416392, at *10 n.11 (M.D.N.C. Feb. 5, 2024); *Worley* v. *Berryhill*, No. 7:18-CV-16-FL, 2019 WL 1272540, at *4 (E.D.N.C. Feb. 4, 2019), *adopted by* 2019 WL 1264870 (E.D.N.C. Mar. 19, 2019).

5:17-CV-00057, 2018 WL 4688741, at *6 (W.D. Va. Sept. 28, 2018) ("In order for the Court to engage in meaningful review of a disability determination made at step four, the ALJ must, at a minimum, explain the past job or identify the duties that she finds the claimant has the RFC to perform.") (citing 20 C.F.R. § 404.1560(b)).

The record shows that Jackson's duties exceeded the DOT's job description of a jailer. Jackson stated twice in his testimony that his work at Albemarle included breaking up fights. Tr. at 59, 77. The ALJ did not ask how frequently this occurred or how much of his time at work he spent on this task. Lacking this information, there was no basis for the VE to opine that breaking up fights was an isolated occurrence that happened only in unusual situations.

So the classification of Jackson's past work as a jailer appears incorrect as it fails to reflect all the duties that position involved. The evidence establishes that Jackson's past work includes significant elements of two occupations—jailer and corrections officer. The record could thus bolster a finding that his past work is a composite job.

Yet the ALJ failed to consider Jackson's past work as a composite job. This error forms a basis for remand. *See Christine L. ex rel. Lorrington L.* v. *Kijakazi*, No. 2:23-CV-132, 2023 WL 8361769, at *5 (E.D. Va. Nov. 6, 2023) (noting that "[c]ourts have found error in an ALJ's analysis of a composite job where the ALJ failed to consider the possibility of a composite job or where the ALJ failed to sufficiently analyze the components of the composite job."), *adopted by* 2023 WL 8357953 (E.D. Va. Dec. 1, 2023); *Douglas E.* v. *Kijakazi*, No. 20-CV-2126, 2022 WL 684122, at *7 (D. Md. Mar. 8, 2022) (remanding because ALJ failed to explain whether the plaintiff's job qualified as a composite job, and noting that the ALJ must explain reasoning even if the ALJ declined to classify the job as a composite job).

### 5. As Generally Performed

If his past work is a composite job, Jackson contends that the ALJ could not conclude that he could do the work as it is generally performed. *See* Program Operations Manual System (POMS) DI 25005.020B ("A composite job does not have a DOT counterpart," so the ALJ should not evaluate it when considering work "as generally performed" at step four.). Instead, where one's past work is a composite job, a finding at step four finding that a claimant could his past work requires that he be able to perform all the duties of the work as it was actually performed. *Id.* (finding a claimant capable of performing the composite job requires that they can perform all parts of the job).

The description of Jackson's past work conflicts with the RFC determination for light work. Light work involves standing or walking for six hours in an eight-hour workday. SSR 83–10, 1983 WL 31251, at *6 (Jan. 1, 1983) ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."). And light work requires frequently lifting up to ten pounds and occasionally lifting or carrying 20 pounds. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."). But Jackson stated that he walked seven hours, climbed for six hours, stood for four hours, sat for two hours in a 12-hour shift, with lifting up to 50 pounds and frequently lifting 25 pounds. So some of the demands of his job at Albemarle exceed the parameters of light work and more closely resemble medium exertion work. The Administration noted as much at both the initial level and upon reconsideration. Tr. at 93, 106.

The ALJ found that Jackson's work as a jailer was light as it is generally performed. Tr. at 36. But this conclusion is untenable. If Jackson's past work is a composite job, it would foreclose

a finding of performing past work as it is generally performed. So the undersigned cannot find that substantial evidence supports the ALJ's assessment given the unresolved question of whether his past work is properly considered a composite job.

In sum, there is support for an argument that Jackson's past work may best be characterized as a composite job. The ALJ erred by misclassifying his past work, failing to determine whether Jackson could perform certain duties of his past work, and not considering the possibility that his past work was a composite job. Where the composite job issue unresolved, the undersigned cannot conclude that substantial evidence supports a finding that Jackson could perform his past work as it is generally performed.

Jackson has presented a meritorious argument on this issue. So the undersigned recommends that the court remand this matter for further consideration of step four.

## III. Conclusion

For all these reasons, the undersigned recommends that the court grant Jackson's request for relief (D.E. 14, 17), deny Bisignano's request for relief (D.E. 16), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will

have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: July 9, 2026

Robert T. Numbers, II
United States Magistrate Judge